No. 82-279

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

---

ST. PAUL FIRE and MARINE INSURANCE
COMPANY, a corporation,

                            Plaintiff and Respondent,

        vs.

KEVIN E. CUMISKEY, JOHN E. CUMISKEY,
STEPHANIE S. CUMISKEY, and K.S.J., INC.,
a Montana corporation,

                            Defendants and Appellants,

        and

ELIZABETH M. BRADLEY,

                            Defendant and Cross Appellant.

---

Appeal from:   District Court of the Eighteenth Judicial District,
               In and for the County of Gallatin
               Honorable Joseph B. Gary, Judge presiding.

Counsel of Record:

        For Appellant:

        Larry W. Moran argued, Bozeman, Montana

        For Cross-Appellant:

        Landoe, Brown, Planalp, Kommers & Lineberger,
         Bozeman, Montana
        Randy K. Dix, argued, Bozeman, Montana

        For Respondents:

        Anderson, Brown, Gerbase, Cebull & Jones, Billings,
         Montana
        James L. Jones argued, Billings, Montana

---

                    Submitted:  March 1, 1983

                    Decided:  June 10, 1983

Filed:   JUN 1 0 1983

_____
                    Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

Cumiskeys and Bradley appeal a judgment upon a Gallatin County jury verdict which set the cost of repairs of fire damaged property, which determined the parties' liabilities to one another and which awarded and set attorney fees. We affirm in part and reverse in part.

In early 1978, Kevin Cumiskey contacted Elizabeth Bradley in order to lease West Yellowstone property owned by Bradley as the site of a Mexican restaurant. They entered into a lease agreement prepared by Cumiskey's attorney which required that Cumiskey insure the property to protect Bradley's interest and which specified that fixtures and alterations added by Cumiskey would remain his property. Kevin opened the restaurant, "Chiripa's," for a short 1978 tourist season, closed it for the winter, and then reopened it for summer 1979. From September 1978 to September 1979, the property was insured in the name of Kevin Cumiskey, d/b/a "Chiripa's." During that period, Kevin improved the premises with funds borrowed from his father, John Cumiskey. At no time was Bradley's interest insured. From September 1979 to June 1980, the property was not insured at all.

In 1979 the restaurant business was incorporated as K.S.J., Inc. (for Kevin, Stephanie, and John Cumiskey), and the lease was assigned to the corporation. Kevin and his mother, Stephanie, each owned 49 percent of the stock. John owned 2 percent. Kevin is president, John is vice president and Stephanie is secretary.

Kevin decided to stay in New York to work for the summer of 1980, so John and Stephanie Cumiskey agreed to spend the summer in West Yellowstone operating the restaurant.

Upon their arrival, the Cumiskeys contacted a Bozeman insurance agency to arrange for reissuance of the prior insurance coverage. Again, the insured on the policy was listed as Kevin Cumiskey, d/b/a "Chiripa's." John and Stephanie ran the restaurant, which had consistently lost money since its opening, until, on August 10, 1980, a series of explosions accompanied by fire damaged the premises.

The fire investigation revealed that the blazes had been intentionally set. Extensive circumstantial evidence focused on John Cumiskey as the alleged arsonist. That evidence included serious burns sustained by Cumiskey, a series of inconsistent and uncorroborated stories told by Cumiskey to explain his burns and his actions after the fire, and the fact that his keys to the restaurant and other objects owned by Cumiskey were found in the street outside Chiripa's after the explosions.

Once the investigation established that the fire had been intentionally set, St. Paul requested that Cumiskeys produce the financial records of the business. John Cumiskey refused to do so for some sixteen months after the August 1980 fire. In October 1980, Kevin Cumiskey filed a claim with St. Paul seeking recovery under the policy. St. Paul was told both that the destroyed property belonged to Kevin Cumiskey and that it was the property of K.S.J., Inc. St. Paul also became aware of the Bradley lease, which required that Bradley's interest be insured.

John Cumiskey was charged with arson and criminal mischief in connection with the fire and was tried in November 1980. The business records were not a part of the criminal trial. Cumiskey's defense was that he was a

wealthy man, that the business was profitable, and that he had no motives for arson. He was acquitted of both charges.

Two months after John Cumiskey's acquittal, St. Paul filed this action for declaratory judgment. In its complaint, St. Paul asked the court to declare Kevin Cumiskey the proper recipient of any policy proceeds, to determine the rights and other legal relationships of the parties, to determine the specific amount of recovery to which Kevin Cumiskey was entitled, and to require that John E. Cumiskey subrogate any claim paid by St. Paul. K.S.J., Inc., was later added to the action by stipulation of the parties.

Bradley cross-claimed against Kevin Cumiskey and K.S.J., Inc., for failure to insure her interest in the building. She also brought a tort claim against John Cumiskey for deliberate destruction of the property. Cumiskeys and K.S.J., Inc., brought counterclaims against St. Paul for the company's breach of both statutory and common-law duties to settle the insurance claims in good faith and for libel and slander.

A number of issues raised were disposed of before the case was given to the jury. Before trial, the District Court entered summary judgment in favor of Bradley on the issue of Kevin Cumiskey's failure to insure Bradley's interest in the premises. K.S.J., Inc., dropped its claim to the insurance proceeds on the day before trial. At the outset of trial, the District Court dismissed Cumiskeys' statutory counterclaim for failure to state a proper claim. It also dismissed Cumiskeys' claim of libel and slander, which was based upon St. Paul's filing of this action for declaratory judgment. At the close of evidence, the trial

-4-

court entered a directed verdict in favor of St. Paul on Cumiskeys' common-law counterclaim for bad faith.

The jury returned a special verdict which determined: (1) St. Paul and Bradley had proved by a preponderance of the evidence that John E. Cumiskey caused the fire; (2) the cost to repair the main building of the restaurant was set at $12,300.00; (3) that Kevin Cumiskey was entitled to recover $19,910.00 under the policy; and, (4) that Bradley was entitled to recover $25,000.00 in punitive damages from John E. Cumiskey. The parties stipulated in the pretrial order that the fire had been set intentionally. The jury was so informed and was instructed that if it found that John E. Cumiskey set the fire, St. Paul was entitled to recover from him the amount it must pay to Kevin Cumiskey under the policy.

Cumiskeys and K.S.J., Inc., moved for a judgment notwithstanding the verdict or in the alternative for a new trial. The motions were denied. Cumiskeys now appeal and Bradley cross-appeals.

Appellants, in their shotgun approach, barrage this Court with issues. We will address only two of those issues. We will also address cross-appellant's claim. We have considered the other errors advanced by appellants and find them to be without merit. We will not concern ourselves with these arguments since they will not change the outcome of this appeal. We also note in passing that appellants' briefs, which contain more vitriol than substance, fail to substantiate their claims with references to the record pursuant to Rule 23(a) and (e), M.R.App.Civ.P.

The issues we address are:

1. Whether the District Court properly directed a verdict on Cumiskeys' counterclaims for bad faith;

2. Whether the District Court properly granted summary judgment in favor of Bradley; and,

3. Whether the District Court correctly calculated the attorney fees awarded to Bradley.

Kevin Cumiskey first challenges dismissal of his bad faith counterclaims against St. Paul. He contends that St. Paul violated both statutory and common-law duties to settle the insurance claims in good faith. The statutory claim is based upon section 33-18-201(6) and (13), MCA, of the Unfair Trade Practice Chapter of the Insurance Code. It provides:

> "Unfair claim settlement practices prohibited. No person may, with such frequency as to indicate a general business practice, do any of the following:
>
> ". . .
>
> "(6) neglect to attempt in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear;
>
> ". . .
>
> "(13) fail to promptly settle claims, if liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage;" (Emphasis added.)

The statutory claim was struck by the District Court prior to trial on the basis that Kevin Cumiskey had not pleaded and was not going to present evidence that St. Paul failed to settle claims "with such frequency to indicate a general business practice." Dismissal of the statutory claim on that basis was proper. Klaudt v. Flink (1983), _____ Mont. _____, 658 P.2d 1065, 40 St.Rep. 64; Harris v. American General Life Insurance Company of Delaware (1983),

-6-

____ Mont. ____, 658 P.2d 1089, 40 St.Rep. 164.

The common-law bad faith claim was disposed of with a directed verdict at the close of evidence. We first recognized that an insurance company has a duty independent of statute or of insurance contract to settle claims in good faith with its insureds in Lipinksi v. The Title Insurance Company (1982), ____ Mont. ____, 655 P.2d 970, 39 St.Rep. 2283. The District Court here properly allowed Kevin Cumiskey to present evidence in support of his claim that St. Paul acted in bad faith and breached that duty. Conflicting evidence was introduced on whether agents of St. Paul had represented that the insurer would settle the claim. Kevin primarily based his claim on the assertion that the filing of the declaratory judgment action was in bad faith since the claim should have been paid and since the action served to destroy the business relationship between Cumiskeys and Bradley. At the close of the evidence, however, the court dismissed that claim with the following statement:

> "I'm going to reverse myself. I am going to grant the motion for a directed verdict on the question of punitive damages to the insurance company on their counterclaim and let you go on your actual damages . . . There was a legitimate question in this case on the basis of who set the fire, how the fire was set, who the claim was in, and the insurance company came in and asked for a declaratory judgment, and the only alternative is to make the insurance company pay in any respect, and then attempt to get it back, and they used the process of the courts and within reasonable time, and so you are, however, entitled to go on your actual damages on your claim."

The District Court properly granted a directed verdict in favor of St. Paul on those grounds. The court should

view a motion for a directed verdict in the light most favorable to the party against whom the motion is directed. Dieruf v. Gollaher (1971), 156 Mont. 440, 481 P.2d 322. Here, even viewed in the light most favorable to Kevin Cumiskey, the court found that St. Paul's decision to bring this action for declaratory judgment was appropriate. We agree.

An action for declaratory judgment may be brought for the purpose of settling and affording "relief from uncertainty and insecurity with respect to rights, status, and other legal relations." Section 27-8-101 et seq., MCA. The action, in order to terminate the controversy as to all parties, should include as parties all persons who have or claim any interest that would be affected by the declaration. Empire Fire & Marine Ins. Co. v. Goodman (1966), 147 Mont. 396, 412 P.2d 569.

If otherwise appropriate, an action for declaratory judgment is not precluded by the existence of another adequate remedy. Rule 57, M.R.Civ.P. In a proper case, an insurer may use this procedural device in order to obtain a determination of the validity, continuance, or coverage of an insurance policy; a determination of the extent of liability; or a determination of the insurer's duties under the policy. 6A Moore's Federal Practice, ¶57.19 at 57-195 through 57-198. We hold that in this case, St. Paul properly filed an action for declaratory judgment.

While Kevin Cumiskey filed a claim for proceeds as the named insured, a potential for liability to other parties also existed. Bradley's interest should have been insured pursuant to the lease agreement and was not. There was the

-8-

possibility that she would attempt to claim all or part of the insurance proceeds.

K.S.J., Inc., insisted throughout most of the lawsuit that it was the named insured since St. Paul's agents had been informed of the incorporation of the business. Not until the day before trial was that claim dropped. John Cumiskey's possible culpability in regard to the fire also raised questions on the insurer's liability. Where an officer, director, stockholder, and managing agent of a corporation is responsible for intentionally setting a fire, the insurer has a valid defense to the claim. 18 Couch on Insurance, 2d, § 74:671; 5 Appleman Insurance Law and Practice, § 3113 (1970). St. Paul had a sufficient basis before the filing of this action to raise that defense.

John Cumiskey argues that section 33-24-102, MCA, requires payment of the policy limit where the property is considered a total loss and where no criminal fault is established on the part of the insured or his assigns. Therefore, he contends that his acquittal on the arson and criminal mischief charges required the insurer to pay the policy limits rather than bringing this action. He ignores the complete contradiction in his stance on the issue of the amount of the loss.

Cumiskeys testified at trial that St. Paul's agents had stated that the building was a total loss and the claim would be paid in full. The agent denied making that statement. No other evidence indicated that the building was a total loss. In fact, while Bradley's estimate on repairs to the building set the cost at approximately $12,500, Cumiskeys presented the affidavit of their contractor and a brief

in opposition to Bradley's motion for summary judgment that set the repair costs at $8,500. At no time throughout the course of this action did Cumiskeys agree to settle Bradley's claim in an amount that would repay her for total loss of the building.

Nor did Cumiskeys introduce evidence to demonstrate the loss to the business itself. The jury relied upon evidence introduced by St. Paul: the business income tax returns and expert testimony by the business's accountant. No evidence was presented that suggested the business was a total loss other than John Cumiskey's statement that an adjustor had stated: "Well, as far as I can see, it's a total loss."

St. Paul also faced a question on the extent it was liable to Kevin Cumiskey as the named insured since the property insured in his name had been assigned to K.S.J., Inc. This creates an issue on the extent of Kevin's right to recover as stockholder. See, 3 Couch on Insurance, § 24:92; Annot., 39 ALR2d 714; 4 Appleman on Insurance, § 2145. The facts of this case presented a justiciable controversy, existing and genuine. The action for declaratory judgment was appropriately brought to determine the legal rights and relationships of the parties. The District Court properly directed a verdict on the issue of bad faith.

Cumiskeys next argue that the District Court erred in granting summary judgment in favor of Bradley on the issue of breach of the lease agreement. They contend that the provisions of the lease allowed Cumiskeys and K.S.J., Inc., to retain any fixtures or other improvements added to the property. Therefore, Bradley was not entitled to summary

judgment on the issue of liability for failure to insure because Bradley's loss was unclear. We disagree.

Bradley's motion for partial summary judgment requested the District Court to find liability for Bradley's damages or loss on the basis of the failure to insure. The amount of damages were undetermined and were to be included as an issue at trial. Cumiskeys and K.S.J., Inc., argued that they had made extensive improvements to the property which, under the terms of the contract, remained their property. Therefore, their contract liability to Bradley under the terms of the agreement was unclear and should be left for a jury determination. This argument is without merit.

The lease agreement clearly required that Kevin Cumiskey or his assigns insure Bradley's interest. They did not. The District Court properly found that the terms on improvements were ambiguous and used an appropriate rule of construction to interpret those clauses.

The lease provided that "ALTERATIONS" were to remain the property of the lessees:

> "The Lessees will be entitled to make, or will suffer to be made, any alterations which they in their sole discretion deem necessary. Any additions to, or alterations of, attached to the said leased property shall not become part of the realty but will remain the sole and separate property of the Lessees. The Lessees agree to advise Lessors in writing of the date upon which such alterations will commence in order to permit the Lessors to post notice of nonresponsibility. The Lessees shall keep the demised premises free from any and all liens arising out of any work performed, materials furnished, or other obligations incurred by the Lessees."

It also provided that "FIXTURES" were to remain the

property of the lessees:

> "It is hereby expressly agreed between the parties to this Lease that any counters, tables, chairs, stoves, ovens, grills, ice machines, sinks, or any other personal property belonging to the Lessees which is brought upon the demised premises and attached thereto, shall not become a fixture and part of the realty. The Lessor hereby expressly grants permission to the Lessees to remove any and all personal property which they bring upon said demised premises. Lessees agree to repair any damage to the premises which is caused by removal of said personal property."

The District Court found that the provision on alterations was unclear in that it did not specify what type of alterations were included. The court therefore found that the specific "FIXTURES" clause controlled the general "ALTERATIONS" clause and that such an interpretation was in conformance with the general practice of Montana landlords and tenants and with Montana statutes. We agree.

Where additions are built or affixed to property by a tenant without an agreement to allow him to remove those additions or fixtures, they may not be removed if their removal will damage the premises. Section 70-18-102, MCA; Sanders v. Butte Motor Co. (1963), 142 Mont. 524, 385 P.2d 263. Here, an agreement exists to allow removal of fixtures and alterations. It is unclear what was contemplated by its terms, however. The contract was prepared by an attorney on behalf of Kevin Cumiskey. Kevin presented it to Bradley for signature. She did not take part in preparation of the terms. The record also demonstrates Kevin Cumiskey's intention to use these clauses to coerce Bradley into renewing the lease or selling her property.

Bradley testified that she had told Kevin Cumiskey on

-12-

several occasions that she was not interested in selling the property and had no intention of doing so. He testified at his deposition that Bradley had agreed to allow him to build additions on skids so that he could "pick them up and carry them away." He was then asked about things that could not be carried away:

> "Q. Those things you could not pick up and carry away I assume you were going to leave on the premises. A. No, I was not.
>
> "Q. What were you going to do with the things you couldn't pick up and move away? A. I was going to use them as a lever for a new lease.
>
> "Q. Could you explain what you mean by that? A. Well, in my lease, all the improvements are mine, and if Mrs. Bradley didn't want to issue me a new lease or give me a fixtures fee, then I would take them out."

It was clear from Kevin's deposition testimony that if Kevin "could build in a 'manner where we could pick it up and carry it away,' it was fine with [Bradley]."

The District Court found ambiguity and conflict in the lease provisions and ruled that those items specifically named in the "FIXTURES" clause (the counters, tables, chairs, etc.) belonged to Cumiskeys and everything else belonged to Bradley. Kevin Cumiskey argued that any improvements or alterations, including wiring in the roof, should belong to him under the "ALTERATIONS" clause. He has failed to demonstrate that the parties intended such an interpretation of the clauses or that an agreement actually existed that would allow damage to the property to remove those alterations. The specific "FIXTURES" clause clearly indicated that any damage to the premises caused by removal of fixtures would be repaired. There is no indication that

the parties contemplated allowing a removal of alterations that might result in damage to the premises.

Where an ambiguous term is used, the parties' intent will govern its construction and extrinsic evidence can be used to discover that intent. Adams v. Chilcott (1979), 182 Mont. 511, 517, 597 P.2d 1140, 1144. A court should look to the whole contract and its purpose in determining intent and is not bound by any single provision or expression. Gropp v. Lotton (1972), 160 Mont. 415, 421, 503 P.2d 661, 664-665. Repugnant provisions should be interpreted in a way to give them some effect, subordinate to the general intent and purpose of the entire contract. Riis v. Day (1980), _____ Mont. _____, 613 P.2d 696, 698, 37 St.Rep. 1093, 1096. Where uncertainty in a written instrument exists, the provisions should properly be construed against the party causing the uncertainty. Parkhill v. Fuselier (1981), _____ Mont. _____, 632 P.2d 1132, 1135, 38 St.Rep. 1424, 1427.

Here, the parties' intent was unclear. It is not certain that Bradley intended to allow Kevin Cumiskey to damage the premises in removing alterations. Cumiskey prepared the lease agreement and was responsibile for the ambiguity that existed. The District Court properly interpreted the provisions to give some effect to each and to conform with general landlord tenant practices.

Cumiskeys then had the opportunity to present evidence of their loss of business fixtures and to dispute Bradley's claim for the cost of repairs. They failed to do so. They may not now argue that the jury may have limited an award to Kevin Cumiskey to the amount of Bradley's cost of repairs. It is apparent that the jury did not. Kevin Cumiskey was

-14-

awarded $19,910, while the cost to repair the building was set at only $12,300.

Further, the lease agreement remained in effect until the end of its term in April 1983. At that time, the building was to be returned to Bradley in its original condition. The effect of the District Court's ruling was simply to remove from the jury an issue not properly before it at that time.

Attorney fees were awarded pursuant to the terms of the lease agreement. Cross-appellant challenges the calculation of those fees.

Bradley's attorneys filed affidavits in support of awarding attorney fees that computed time expended: (1) solely relating to pretrial matters concerning Bradley's claims against Kevin Cumiskey and K.S.J., Inc., and excluding all time spent in preparation of the tort claim against John Cumiskey (39.4 hours at $60 = $2,364); (2) for the entire six days of trial time actually expended (6 days at $750 per day = $4,500); and, (3) for services rendered in connection with the preparation, briefing and attendance at the hearing on the claim for attorney fees ($348). The aggregate amount requested was $7,212.

The District Court granted attorney fees for the pretrial preparation, for the work in preparing for the hearing on attorney fees and for one-third of the trial time. In its supporting memorandum, the District Court noted that possibly less than one-third of trial time was actually occupied with Bradley's claim against Kevin Cumiskey and that most of her effort was against John

Cumiskey for wrongful setting of the fire and destruction of the premises. We hold that the District Court erred in both the calculation of the attorney fees and in the reduction of fees for trial time to one-third of the request.

In its order, the District Court awarded $2,636, "which represents one-third (1/3) of the attorneys' fees for the entire trial" and awarded $348 for presentation of the hearing on attorney fees plus an additional brief. The sum of $6,864 does not represent the fees for the entire trial. That figure is the total of both the pretrial preparation work directly relating to the claim against Kevin Cumiskey and the six full days of trial. The District Court erred in reducing both figures by two-thirds where the pretrial work all related specifically to the Kevin Cumiskey claim. At a minimum, the award should have included $2,364 for the pretrial work, $1,500 for two days of trial, and $348 for the attorney fees hearing, for a total of $4,212. We further hold, however, that it erred in reducing fees awarded for the trial time by two-thirds.

Bradley was forced to pursue her claim against Kevin Cumiskey through the trial. She attempted to resolve the damages issue stemming from Kevin's breach of the lease agreement through a motion for summary judgment. Kevin Cumiskey successfully resisted that motion on the basis of an affidavit provided by his contractor that disputed the Bradley repair estimates. Bradley and her counsel were therefore forced to attend a six-day trial. She presented damages testimony that went unchallenged. Kevin Cumiskey introduced no evidence whatsoever in dispute of her claim.

Here, the record reveals that the trial schedule

required that counsel for Bradley be present throughout the six days in order to pursue the claim against Kevin Cumiskey. The entire first day of trial was spent in jury selection. On the morning of the second day of trial, Bradley's counsel gave his opening statement. On the fourth day, a witness offered by Cumiskeys required extensive cross-examination on Bradley's behalf to establish that even Cumiskey's evidence supported the amount of damages she claimed. On the fifth day, counsel was required to object to Kevin Cumiskey's attempt to testify to the building's condition prior to acquisition of the lease. Kevin attempted to introduce this matter in spite of a pretrial ruling that the evidence was improper. Much of the last day of trial was spent in settlement of instructions, presentation of Bradley's case-in-chief, and closing arguments.

In this instance it is not possible to clearly segregate the trial time during which Bradley pursued her claims against Kevin Cumiskey into one-third of the time expended. We reverse the District Court's order on attorney fees dated March 18, 1982, and hold that Bradley is entitled to attorney fees in the amount of $7,212 in connection with the proceedings below and an additional $1,500 for the efforts expended on appeal. We remand this matter to the District Court for further proceedings not inconsistent with this opinion.

Affirmed in part and reversed in part.

_____
Chief Justice

We concur:

_____
John Conway Harrison

_____

_____
Daniel J. Shea

_____

_____
L. C. Gulbrandson.

_____
Justices

Mr. Justice John C. Sheehy, concurring in part and dissenting in part:

I dissent from that portion of the foregoing opinion which affirms the District Court's dismissal of Kevin Cumiskey's bad-faith action against St. Paul Fire and Marine Insurance Company.

Under our recent spate of decisions on the point of bad faith, Kevin's cause of action should have been submitted to the jury. See Klaudt v. Flink, 658 P.2d 1065 40 St.Rep. 64; Lipinski v. The Title Insurance Company (1982) _____ Montana _____, 655 P.2d 970, 39 St.Rep. 2283.

I am also of the opinion that the District Court should have submitted the question of total loss to the jury to determine if the valued policy law, Section 33-24-102, MCA, was applicable to Kevin's claim against St. Paul. The District Court's interpretation of the valued policy law was disadvantageous to Kevin, and would make no difference to St. Paul, since it, under the verdict, would be subrogated for anything it paid to Kevin from John Cumiskey.

Otherwise, I concur in the judgment entered in the District Court.

_____
Justice